```
              IN THE UNITED STATES DISTRICT COURT
               FOR THE SOUTHERN DISTRICT OF OHIO
                        EASTERN DIVISION
```

**KATHLEEN HEMINGWAY on behalf
of Daniel Hemingway,**

      **Plaintiff,**

     vs.                                   **Civil Action 2:07-CV-27
                                           Judge Holschuh
                                           Magistrate Judge King**

**COMMISSIONER OF SOCIAL SECURITY,**

      **Defendant.**

### REPORT AND RECOMMENDATION

      This is an action instituted under the provisions of 42 U.S.C. §405(g) for review of a final decision of the Commissioner of Social Security granting in part and denying in part the application for disability insurance benefits filed by Daniel Hemingway, now deceased ["the claimant"].  This matter is now before the Court on plaintiff's *Statement of Errors* and the Commissioner's *Memorandum in Opposition.*

      The claimant filed his application for benefits in July 2003, alleging disability since August 2002 as a result of arthritis. The application was denied initially and upon reconsideration, and Daniel Hemingway requested a *de novo* hearing before an administrative law judge. On September 17, 2004, prior to the administrative hearing, the claimant died of coronary artery disease and his widow now pursues his claim.

      The administrative hearing was held on July 25, 2005. Kathleen Hemingway, the claimant's widow, appeared and testified at the administrative hearing, as did Richard Oestreich, Ph.D., who testified as a vocational expert.

      In a decision dated April 27, 2006, the administrative law judge found that Daniel Hemingway was disabled from July 7, 2004 -- the date that he suffered a massive heart attack -- until his death on

September 17, 2004, but not prior to that date.  That decision became the final decision of the Commissioner of Social Security when the Appeals Council declined review on November 17, 2006.

Plaintiff contends that the administrative law judge failed to accord sufficient deference to the opinions articulated by Bharati Deka, M.D., plaintiff's treating internist.  In a related argument, the plaintiff also contends that, because the administrative law judge rejected the limitations articulated by Dr. Deka, her reliance on the testimony of the vocational expert, which was based on an assertedly flawed hypothetical, is also in error.  Finally, plaintiff contends that the administrative law judge's credibility determination was flawed.

Pursuant to 42 U.S.C. §405(g), judicial review of the Commissioner's decision is limited to determining whether the findings of the administrative law judge are supported by substantial evidence and employed the proper legal standards.  *Richardson v. Perales*, 402 U.S. 389 (1971).  Substantial evidence is more than a scintilla of evidence but less than a preponderance;  it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.  *See Buxton v. Halter,* 246 F.3d 762, 772 (6th Cir. 2001); *Kirk v. Secretary of Health & Human Servs*., 667 F.2d 524, 535 (6th Cir. 1981).  This Court does not try the case *de novo*, nor does it resolve conflicts in the evidence or questions of credibility.  *See Brainard v. Secretary of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989);  *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).

In determining the existence of substantial evidence, this Court must examine the administrative record as a whole.  *Kirk*, 667 F.2d at 536.  If the Commissioner's decision is supported by substantial

2

evidence, it must be affirmed even if this Court would decide the matter differently, see *Kinsella v. Schweiker*, 708 F.2d 1058, 1059 (6th Cir. 1983), and even if substantial evidence also supports the opposite conclusion. *Longworth v. Comm'r Soc. Sec.,* 402 F.3d 591, 595 (6th Cir. 2005).

The claimant was 50 years of age at his alleged date of onset of disability. He had a high school education and 35 years experience as a meat cutter. He had not worked since his alleged date of onset of disability. *A.R.* 556. Plaintiff's widow testified at the administrative hearing that her husband came home one day and told her "I can't do the lifting. I can't do the repetitive motions. ... I just can't stand it anymore." *A.R.* 558. Mrs. Hemingway "knew that he had to be hurting very badly." *Id.*

The medical evidence includes a number of references to degenerative joint disease. *See, e.g., A.R.* 137 (right shoulder, knee and ankle and associated pain), 138, 180. Dr. Deka treated the claimant beginning November 2002. The doctor diagnosed, *inter alia,* arthritis. Dr. Deka also noted that a finger on the claimant's left hand was bent. *A.R.* 180.

Dr. Deka referred plaintiff to V. Kim Newsome, D.O., a Board-certified rheumatologist, who reported in March 2003 that the claimant complained of pain, stiffness, numbness, and swelling in his fingers, shoulders, knees, ankles and back, and which had progressively worsened over the prior 5 years. *A.R.* 177. He also reported dropping objects because of weakness and because his fingers locked up. On examination, Dr. Newsome reported flexion contractures at the left fifth PIP joint and stenosing tenosynovitis. There was also tenderness in the paravertebral muscles of the lumbar spine and crepitus and tenderness of the knees.

Dr. Newsome diagnosed significant diffuse osteoarthritis causing chronic pain, stenosing tendonitis, mechanical low back pain, diffuse arthralgias, questionable carpal tunnel syndrome, history of anxiety, depression, hypertension, COPD, and constipation. Dr. Newsome prescribed Celebrex.  *A.R.* 177.  Dr. Newsome noted the following month that x-rays of the hands and feet were consistent with osteoarthritis.  Rheumatoid factor was negative.  Dr. Newsome reaffirmed her earlier diagnoses and prescribed physical therapy for bilateral knee osteoarthritis.  She also recommended an orthopedic consult "if hand pain becomes worse," *A.R.* 176, and Neurontin "[i]f pain becomes severe and chronic."  *Id.*

During an October 2003 office visit, Dr. Deka noted that Celebrex had not alleviated the claimant's pain, although Ibuprofen did. *A.R.* 174.  That same month, Dr. Deka completed a multiple impairments questionnaire provided by the claimant's disability counsel and diagnosed, *inter alia,* diffuse osteoarthritis, stenosing tenosynovitis of the hands.  The doctor specifically noted a deformity of the left ring finger and flexion contracture of the left fifth PIP joint.  Dr. Deka also noted muscle tenderness of the lumbar spine and tenderness bilaterally of the knees and elbows.  *A.R.* 153.  Although the doctor indicated that the claimant's pain was constant, *A.R.* 155, Dr. Deka also commented that the joint pain returns "on prolonged physical activity. ..."  *Id.*  Pain also disrupted his sleep.  According to Dr. Deka, the claimant could sit for 8 hours but could stand and walk for no more than 1 hour.  He would be required to change position 3-4 times throughout an 8-hour work day, for about ½ hour each time.  He should not stand or walk continuously in a work setting.  He could frequently lift and carry up to 20 pounds.  *A.R.* 156.  According to Dr. Deka, the claimant would have significant limitations in performing repetitive reaching, handling,

4

fingering or lifting and grasping; turning and twisting objects with both his right and left hands was essentially precluded. *A.R.* 156-57. His pain and fatigue would constantly interfere with attention and concentration. *A.R.* 158. Nevertheless, Dr. Deka also indicated that the claimant could "do a full time competitive job that requires [keeping neck in a constant position] on a sustained basis" and could tolerate low stress work. *Id.* He would be required to take 3-4 unscheduled breaks throughout an 8-hour workday, each lasting ½ hour. *A.R.* 158. He would likely be absent from work as a result of his impairments or the treatment of his impairments more than 3 times per month. *A.R.* 159.

In November 2003, the claimant suffered a comminuted fracture of the right ulna as a result of a tractor accident. *A.R.* 172, 173. Dr. Deka referred the claimant to an orthopedic specialist, Steven V. Priano, M.D., who reported that, on clinical examination, plaintiff had 5/5 strength in the biceps, triceps, supinator and pronater muscles. Range of motion was within normal limits and equal bilaterally. There was no clicking or catching with range of motion testing. *A.R.* 200. Dr. Priano placed plaintiff in a long arm cast. *Id.*

In December 2003, the claimant underwent a consultative orthopedic evaluation by Stephen Nutter, M.D., a specialist in occupational medicine, at the request of the state agency. Dr. Nutter noted that the claimant's right arm was in a cast "up to about the mid humerus," *A.R.* 204, which resulted in some limitation in range of motion and made evaluation of function difficult. The claimant reported joint pain over the prior 15 years in his hands, wrists, elbows, shoulders, hips, knees, ankles and feet. *A.R.* 202. Standing for prolonged periods of time caused pain in his feet and knees; his right knee sometimes felt like it could cause him to fall, although he had not actually fallen.

*A.R.* 202-03. He also complained of a burning pain in his back, aggravated by bending, stooping, standing and lifting. *A.R.* 203. He reported taking Neurontin. On clinical examination, plaintiff had a normal gait and appeared to be comfortable in both the sitting and supine positions. *A.R.* 204. Pain and tenderness were reported in both shoulders and both hands diffusely. Dr. Nutter also noted "a slight amount of atrophy in the left hand," although the right hand could not be examined. *A.R.* 204. Grip strength of the left hand was normal at 5/5. Dr. Nutter noted pain and tenderness in both ankles and feet, but no tenderness in the knees. Pulses in the lower extremity were normal, except the left posterior tibial pulse, which was not palpable. On examination of the spine, straight leg raising was limited by pain to 60 degrees on the right and to 55 degrees on the left. Dr. Nutter diagnosed osteoarthritis, acute fracture of the forearm and chronic lumbosacral strain without evidence of radiculopathy. *A.R.* 206. Dr. Nutter summarized: "[G]rip strength was[,] as noted, normal on the left and unable to be tested on the right. Fine manipulation skills were a little difficult due to the cast, but otherwise intact. Sensory and motor modalities were intact with the exception of the inability to test the right arm. There is no definite evidence of nerve root compression. ..." *Id*. According to Dr. Nutter,

> The claimant's ability to bend would be moderately impaired. As far as lifting and carrying heavy objects, this would have to be something that he could do with the left hand only as he cannot grasp with the right arm currently as it is in a cast. He should avoid climbing ladders and scaffolding because of this. Sitting would be mild to moderately impaired because of back pain. Standing is moderately to severely impaired because of pain and joint pain. He should avoid any jobs that would require squatting. Fine manipulation skills are affected currently because of the cast on the right hand. Fine manipulation skills were intact in the left hand. Speech, hearing and sight are

unimpaired. *A.R.* 206-07.

X-rays of the lumbar spine and right wrist performed in February 2004 documented osteoporosis and facet degenerative joint disease of L4-S1 bilaterally. A.R. 544.

In early 2004, state agency physicians reviewed the evidence of record relating to the claimant's physical capacity and concluded that the claimant could occasionally lift and carry up to 20 pounds and frequently lift and carry up to 10 pounds. Throughout an 8-hour workday, the claimant could sit about 6 hours and stand and/or walk with normal breaks for about 6 hours. He was unlimited in his ability to push and pull with his hands and feet. The doctors noted that x-rays documented degenerative joint disease of the hands and feet, but that grip strength was 5/5 and the claimant was able to manipulate without difficulty except as impeded by the right forearm cast. He could never climb ladders, ropes or scaffolds but could frequently balance. The state agency physicians expressly indicated that manipulative skills were not shown to be limited despite evidence of osteoarthritis. *A.R.* 224. The doctors also expressly stated, "pain was considered in determining [the residual functional capacity.]" *A.R.* 226.[1]

The claimant's right arm fracture had healed without deformity by May 2004. *A.R.* 542. However, the claimant continued to complain to Dr. Deka of pain, tingling and numbness in both hands. *A.R.* 537.

Mrs. Hemingway testified at the administrative hearing that

---

[1] Curiously, the state agency physicians indicated that a treating and examining physician's statement regarding the claimant's physical capacity was not in the file, *A.R.* 226, which would suggest that the agency physicians did not consider either Dr. Nutter's evaluation or Dr. Deka's October 2003 residual functional capacity assessment. However, the record indicates that, in conjunction with the notice of reconsideration, the reports of both Dr. Deka and Dr. Nutter were in fact part of the record reviewed by the state agency physicians. *See A.R.* 55, 60.

her husband could not have worked at any job:

> I lived with the man for 33 years and saw his mental capacity, as far as concentration, that kind of stuff, go down hill. He, his back hurt. He had trouble sitting for long periods of time. Just his concentration. His level of being able to, his though[t] process is the only way I can explain it, being able to thin[k] through something anymore was very hard for him.

*A.R.* 559.

> ... [I]t was obvious that, you know, probably from the time he got up in the morning until the time he went to bed he was in some kind of pain. He had trouble grasping things. He had trouble picking things up. ... As far as trying to pick up something small like say, maybe a nut or a bolt or something like that, ... there was, he couldn't keep it in his hand.

*A.R.* 564. During the last few years of her husband's life, Mrs. Hemingway had to assist her husband in showering and buttoning his shirt. *A.R.* 567. He quit playing the guitar in 2001 "because his fingers wouldn't work ... ." *A.R.* 570-71.

Despite his pain, Mrs. Hemingway testified that her husband used only Tylenol and Advil for pain.[2]

The administrative law judge asked the vocational expert to assume the claimant's vocational profile and the residual functional capacity articulated by the state agency physicians. *A.R.* 572. The vocational expert testified that such a claimant could perform 20 percent of available light work, and 25 percent of available sedentary work, *A.R.* 572, including such jobs as hand packer, assembler and inspector. If, however, a claimant could only occasionally engage in gross and fine manipulation, *i.e.,* for 1/3 of the workday, that claimant could not engage in either sedentary or light work. *A.R.* 574. Similarly, assuming

---

[2] Mrs. Hemingway explained that her husband had quit drinking 6 years prior to his death "and he didn't want to hurt his liver anymore." *A.R.* 559.

the residual functional capacity assessment articulated by Dr. Deka, a claimant would be unable to perform any work.  *Id.*

In her decision, the administrative law judge found that the claimant was disabled from the time of his massive heart attack in July 2004 until his death in September of that year.  Prior to July 7, 2004, the claimant's severe impairments consisted of diffuse osteoarthritis affecting the shoulders, arms, hands, knees, feet and spine, osteoporosis, scoliosis and kyphosis of the dorsolumbar spine with degenerative joint disease from L4-S1 bilaterally, stenosing tenosynovitis of the hands, bilateral carpal tunnel syndrome, greater on the left, status post fracture of the right ulna, chronic restrictive and obstructive pulmonary disease, chronic rhinitis and sinusitis, hypertension, depression and history of alcohol abuse in long term remission.  *A.R.* 35.  From his alleged date of onset through July 6, 2004, the administrative law judge found, the claimant had the residual functional capacity described by the state agency physicians:

> that is, he could have lifted and/or carried 10 pounds frequently and 20 pounds occasionally. He could have stood and/or walked (with normal breaks) for a total of about 6 hours in an 8-hour workday. He could have sat (with normal breaks) for a total of about 6 hours in an 8-hour workday.  He had no limitations on his ability to push and/or pull (including the operation of hand and/or foot controls) other than as shown for the ability to lift and carrying.  He could have occasionally climbed ramps and stairs.  He could never have climbed ladders, ropes, or scaffolds.  He could frequently have balanced.  He could have occasionally stooped, knelt, crouched and crawled. He had no manipulative, visual or communicative limitations.  He had no environmental limitations, except that he needed to avoid concentrated exposure to fumes, odors, dusts, gases, poor ventilation, etc. Mentally, he was restricted to the performance of simple, routine tasks in a relatively solitary work environment with minimal or superficial contact with others.

*A.R.* 37.  The administrative law judge also found that allegations of

disabling pain, mental symptoms and functional restrictions during that period of time, made by the claimant or as testified to by his widow, were not fully credible.  *Id.*

In making this credibility finding, the administrative law judge referred to the factors contained in 20 C.F.R. §404.1529(c)(3), which governs credibility determinations, and provided an extensive discussion of those factors.  *A.R.* 37-38.  The administrative law judge noted specifically that, according to his widow, the claimant took only non-prescription pain medication, received very little treatment, was not treated at a chronic pain rehabilitation facility and had not been hospitalized during the relevant time period.  *A.R.* 37.  Noting that his widow was confused as to which of the claimant's fingers suffered the severe contracture, *see A.R.* 563-64, the administrative law judge commented, "[T]his was a problem that the claimant had every day and it would seem that his wife, were her memory reliable, would remember which hand was affected.  This detracts from her overall reliability concerning the claimant's other impairments."  *A.R.* 38.  The administrative law judge also noted that the medical record "contains many subjective complaints (*e.g.,* pain, tenderness and positive straight leg raising), but relatively few objective findings."  *A.R.* 38.  In this regard, the administrative law judge noted the relatively benign findings reflected in Dr. Priano's November 2003 report and in Dr. Nutter's December 2003 consultative examination.  *Id.*  The administrative law judge rejected most of Dr. Deka's residual functional capacity assessment as inconsistent with the objective medical evidence:

> Dr. Deka's opinion ... that the claimant was restricted to lifting and carrying 20 pounds is accepted. His opinion that the claimant has marked restrictions in his ability to perform other basic work-related tasks, however, is rejected. In this regard, his opinion is inconsistent with the

10

> objective medical evidence from August 31, 2002 to July 6, 2004; appears to be based on the claimant's subjective complaints; and is inconsistent with the claimant's relatively extensive activities of daily living and course of treatment [during that period].

*A.R.* 39. To the extent that Dr. Nutter's opinion is more restrictive than the residual functional capacity found by her, the administrative law judge rejected that opinion, too, as "inconsistent with the record as a whole, including the objective medical evidence, the claimant's relatively extensive activities, and his course of treatment. ..." *Id.*

Relying on the testimony of the vocational expert, then, the administrative law judge found that, despite the claimant's severe impairments during the period August 31, 2002 through July 6, 2004, which precluded the performance by him of his past relevant work, he had the residual functional capacity to perform a limited range of light work and a significant number of jobs that exist in the economy. After that date, the administrative law judge found that the claimant was disabled until his death, approximately two months later. Because, however, the claimant "never completed his 5-month waiting period[,] ... [he] was never entitled to a period of disability and disability insurance benefits." *A.R.* 41.

Plaintiff contends, first, that the administrative law judge failed to follow the treating physician rule. Opinions of treating physicians must be accorded controlling weight if they are "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and not "inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. §404.1527(d)(2). If the administrative law judge finds that either of these criteria have not been met, he is then required to apply the following factors in determining the weight to be given a treating physician's opinion: "The length of the treatment

11

relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and the specialization of the treating source. ..." *Wilson v. Comm'r of Soc. Sec.,* 378 F.3d 541, 544 (6th Cir. 2004). In this regard, the administrative law judge is required to look at the record as a whole to determine whether substantial evidence is inconsistent with the treating physician's assessment. *See* 20 C.F.R. §404.1527(d)(2),(4).

Plaintiff specifically contends that Dr. Deka's assessment of the claimant is uncontradicted on the record and therefore warrants total deference. This Court disagrees. First, the administrative law judge adopted Dr. Deka's weight restrictions in finding that the claimant was able to lift and carry no more than 20 pounds. She rejected Dr. Deka's complete restriction on the claimant's ability to use his hands. In this regard, Dr. Nutter's consultative evaluation indicated that plaintiff had no limitations on his ability to engage in fine or gross manipulation, *A.R.* 206, apart from that temporarily caused by his broken right arm. Although Dr. Deka's diagnoses of osteoarthritis are, as plaintiff notes, documented on record, his assessment of the limitations caused by those conditions is not uncontroverted.

Plaintiff also contends that the administrative law judge should have accorded greater weight to the assessments of Dr. Deka and Dr. Nutter than to those of the state agency physicians. According to Dr. Nutter, plaintiff's back and joint pain would result in a moderate to severe impairment in standing. *A.R.* 206. The administrative law judge rejected Dr. Nutter's opinion to the extent that it would be preclusive of the reduced range of light work found by the administrative law judge because it was "inconsistent with the record as a whole,

including the objective medical evidence, the claimant's relatively extensive activities, and his course of treatment. ..." A.R. 39.

Dr. Nutter diagnosed chronic lumbosacral strain without evidence of radiculopathy, Dr. Deka's treatment notes focused on problems with the claimant's hands, rather than his back. Moreover, both Dr. Deka's notes and Mrs. Hemingway indicated that non-prescription pain medicine was effective. *See A.R.* 174, 559. It is apparent, in light of the relatively mild objective findings, that Dr. Nutter based his limitations primarily on the claimant's subjective complaints of pain. *See, e.g., A.R.* 205 (straight leg raising positive "due to pain").

The Court concludes that the administrative law judge evaluated all physicians' statements and assessments by reference to the proper standards and gave good reasons for failing to credit most of Dr. Deka's assessment and a portion of Dr. Nutter's assessment. *See Rogers v. Comm'r of Soc. Sec.,* 486 F.3d 234, 242 (6th Cir. 2007).

Plaintiff also challenges the administrative law judge's credibility determination. The administrative law judge's assessment of credibility is entitled to great weight and deference because it is she who had the opportunity to observe the witnesses' demeanor. *Walter v. Commissioner of Social Security,* 127 F.3d 525, 531 (6th Cir. 1997). A claimant's assertions of disabling pain must be analyzed by reference to the factors set forth in 20 C.F.R. §§404.1529, summarized as follows:

> First, we examine whether there is objective medical evidence of an underlying medical condition. If there is, we then examine: (1) whether objective medical evidence confirms the severity of the alleged pain arising from the condition; or (2) whether the objectively established condition is of such severity that it can reasonably be expected to produce the alleged disabling pain.

*Walters,* 127 F.3d at 531 (quoting *Felisky v. Bowen*, 35 F.3d 1027, 1038-39

13

(6th Cir. 1994)). "Whenever a claimant's complaints regarding symptoms, or their intensity and persistence, are not supported by objective medical evidence, the ALJ must make a determination of the credibility of the claimant in connection with his or her complaints 'based on a consideration of the entire case record.'" *Rogers,* 486 F.3d at 247.

In discounting the claimant's allegations of disabling pain, however, the administrative law judge noted that he took only Advil and Tylenol. Although his widow testified that he rejected stronger prescription medication because of his history of substance abuse, the fact remains that plaintiff's pain medications were relatively slight. Moreover, as the administrative law judge noted, plaintiff's conditions, apart from his cardiac condition, did not require hospitalization and he was never referred to a chronic pain facility. Both Dr. Priano, the orthopedic specialist to whom the claimant was referred following the tractor accident, and Dr. Nutter noted that the claimant's gait was normal. Moreover, although Mrs. Hemingway testified that her husband could not engage in fine manipulation, Dr. Nutter's evaluation found to the contrary.

In making her credibility determinations, the administrative law judge expressly invoked the standards of 20 C.F.R. §404.1529, *A.R.* 37, and consider the record as a whole, including the opinions of the state agency physicians who indicated that "[p]ain was considered in determining" the residual functional capacity assessment articulated by them. *A.R.* 226. Although the evidence of record in this action could, as plaintiff suggests, support a finding of greater impairment of function by reason of the claimant's allegations of pain, the administrative law judge has applied the correct standards for evaluating such allegations and has articulated the basis for her credibility

14

determinations. Under these circumstances, the Court cannot substitute its own judgment in this regard for that of the administrative law judge and the Commissioner.

Finally, plaintiff contends that, because the administrative law judge's residual functional capacity assessment is not supported by substantial evidence, her reliance on the vocational expert, whose testimony was based upon that residual functional capacity assessment, was improper. An administrative law judge may properly pose to the vocational expert a hypothetical reflecting of the administrative law judge's findings and credibility determinations. *See Jones v. Commissioner of social Security,* 336 F.3d 469, 475-76 (6th Cir. 2003). Because the residual functional capacity assessment and credibility findings of the administrative law judge in this action are, for the reasons previously stated, supported by substantial evidence, the hypothetical posed by the administrative law judge, which incorporated that assessment and those findings, was not improper. Accordingly, the administrative law judge did not err in relying on the testimony of the vocational expert. *See Varley v. Secretary of Health and Human Services,* 820 F.2d 777, 779 (6th Cir. 1987).

It is therefore **RECOMMENDED** that the decision of the Commissioner be **AFFIRMED** and that this action be **DISMISSED.**

If any party seeks review by the District Judge of this *Report and Recommendation,* that party may, within ten (10) days, file and serve on all parties objections to the *Report and Recommendation,* specifically designating this *Report and Recommendation,* and the part thereof in question, as well as the basis for objection thereto. 28 U.S.C. §636(b)(1); F.R. Civ. P. 72(b). Response to objections must be filed within ten (10) days after being served with a copy thereof. F.R. Civ.

P. 72(b).

The parties are specifically advised that failure to object to the *Report and Recommendation* will result in a waiver of the right to *de novo* review by the District Judge and of the right to appeal the decision of the District Court adopting the *Report and Recommendation*. See *Thomas v. Arn*, 474 U.S. 140 (1985); *Smith v. Detroit Federation of Teachers, Local 231 etc.*, 829 F.2d 1370 (6th Cir. 1987); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).


February 21, 2008              *s/Norah McCann King*
                                  Norah M$^c$Cann King
                           United States Magistrate Judge